UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

*********************************************
\*
In Re:                                       *   Chapter 11
ARSN Liquidation Corp., Inc.                 *   Case No.  14-11527-BAH
ARN Liquidation Corp., Inc.                  *   Case No.  14-11529-BAH
                                             *   (Jointly Administered)
         Debtor(s)                           *   Hearing Date:  04/01/2015
                                             *   Hearing Time: 2:00 p.m.
                                             *   Objection Deadline:  03/25/2015
*********************************************

## DEBTORS IN-POSSESSIONS' JOINT DISCLOSURE STATEMENT FOR JOINT PLAN OF LIQUIDATION DATED FEBRUARY 6, 2015

ARSN Liquidation Corp., Inc. and ARN Liquidation Corp., Inc. (Collectively the "Debtors" separately "ARSN" and "ARN") submit this Disclosure Statement for their Joint Plan of Liquidation dated February 6, 2015, (hereinafter the "Plan") pursuant to Chapter 11 of Title 11 of the United States Code.  The Plan is attached to a Disclosure Statement to be approved by the Bankruptcy Court.  The Disclosure Statement discusses the history, business, and prospects of the Debtor and provides a summary and analysis of the Plan.  All creditors are encouraged to review the Disclosure Statement; it is the only document approved by the Bankruptcy Court for use in soliciting the acceptance or rejection of this Plan.

SUBSTANTIALLY ALL OF THE ARSN'S ASSETS HAVE BEEN SOLD TO A THIRD PARTY BUYER IN ACCORDANCE WITH A FINAL SALE ORDER DATED DECEMBER 15, 2014 (The "SALE ORDER"). ARN IS AN AFFILIATED COMPANY CREATED ONLY FOR MANAGEMENT PURPOSES, AND WITHOUT ASSETS OF ANY KIND.  THE BUYER WILL BE PAYING FUNDS FOR THE PURCHASE OVER A FIVE (5) YEAR PERIOD. THE PURPOSE OF THIS JOINT LIQUIDATING PLAN IS TO PROVIDE THE MECHANISM FOR THE PAYMENT OF THE FUNDS TO A PLAN TRUSTEE APPOINTED UNDER THIS PLAN, SO THAT THE PLAN TRUSTEE CAN MAKE PAYMENTS TO ALLOWED CLAIMHOLDERS AS PROVIDED IN THE PLAN.  THE PLAN TRUSTEE WILL ALSO HAVE THE OPPORTUNITY TO PURSUE RECOVERY ACTIONS FOR THE ESTATE.

THE ONLY ALTERNATIVE TO THE PLAN IS CHAPTER 7 LIQUIDATION OR DISMISSAL OF THE CASE, BOTH OF WHICH WILL GENERATE ADDITIONAL COST AND CONFUSION, AND THERE WILL BE NO CARVE-OUT FOR UNSECURED CREDITORS IN CHAPTER 7 AND NO RECEIVER OF THE FUNDS FROM THE EARN-OUT.

THE DEBTORS BELIEVE THE LIQUIDATING PLAN IS IN THE BEST INTERESTS OF ALL PARTIES UNDER THE CIRCUMSTANCES OF THIS CASE.

## ARTICLE I

## BACKGROUND

Prior to the Petition Date the ARSN was in the business of supplying temporary workers in the light industry and food industries to various businesses, large and small, in New Hampshire and Massachusetts.  The other jointly administered Debtor, American Resource Network, Inc. ("ARN"), is a Massachusetts corporation which is strictly a management company for ARSN.   ARN and ARSN are sometimes referred to herein collectively, as "the Debtors."  The Debtors each filed a voluntary petition under Title 11 Chapter 11 of the United States Code on July 31, 2014 ("Petition Date").  Shortly thereafter the Court granted joint administration of the Debtors.  Since the Petition Date each of the Debtors has continued to operate its business and manage its property as a debtor-in-possession pursuant to §1107 and §1108 of the Bankruptcy Code.  No creditors committee has been appointed in either case.

ARSN is a New Hampshire corporation with its principal place of business located at 165 South River Road, Unit C, Bedford, NH 03110.  ARN is a Massachusetts corporation with a principal place of business at the same location.  ARSN supplies temporary workers to a variety of businesses in New Hampshire and Massachusetts.  ARN does no separate business; it is simply a separate corporation set up for management employees who might get different benefits from ARSN employees.  The Debtors have been in business for over 27 years and have a great reputation in the ARSN business.

ARSN is the owner and operator of a large temporary staffing business which provides workers to a variety of businesses in New Hampshire and Massachusetts in a variety of fields, particularly the food or light industry business.  The Debtors' combined gross sales are approximately $33 million dollars a year, with ARSN paying ARN a management fee only (no profit) to cover ARN's operating expenses. The Debtor provides quality temporary employment, temporary to permanent placements and direct placements to dozens of companies, both large and small, in New England.  The Debtor, and particularly its principal, Richard Purtell ("Purtell"), is a well-known and respected member of the ARSN industry.  The Debtor has a program to assist military personnel re-entering the workforce with securing employment.  Upon the Petition Date ARSN supplied approximately 1,023 workers to other businesses (which number fluctuates from week-to-week) and ARN had approximately 40 employees managing ARSN.  Summer tends to be the slowest season for the Debtors' business, with business expected to increase in the fall.

The Debtors have no secured creditors other than the Internal Revenue Service ("IRS"), which has liens recorded at the New Hampshire Secretary of State's office on all of the Debtors' assets for various employment taxes owed. The State of Massachusetts is not believed to have any liens that are properly perfected and attach to any assets.  Amounts owed to the IRS for various employment taxes total approximately $7,080,806.95 for ARSN ($9.5 million through their proof of claim), which amount includes penalties and interest.  There are no consensual lienholders.  Debtor's debts to unsecured creditors total approximately $5 million, but a portion of that, such as amounts owed for leases of various rental locations, have been assumed by the Buyer (defined below.)

2

ARSN's (and ARN's) sole source of income is the operation of the ARSN business. ARSN provides employees to various businesses at an agreed price, usually with a profit margin of approximately 12%, then pays the employees and keeps the profit margin to operate the Debtors' business operations. ARN charges ARSN a management fee (no profit) to cover the payment of management employees. On the Petition Date, ARSN had approximately 1,023 employees.

Pre-petition, ARSN was involved in a vicious cycle of rising employment tax obligations, on both the state and federal level, and an inability to become current on past-due obligations. ARSN saw its tax obligations grow and grow, due in large part to a tough economy (resulting in fewer requests for employees from third party employers, and resulting in growing unemployment tax obligations to ARSN) and in some part due to repeated self-help levy measures by the taxing authorities, particularly the Commonwealth of Massachusetts.

ARSN tried to work with the taxing authorities to pay down obligations, but business tends to be cyclical, and when it periodically could not honor payment arrangements on past-due amounts (and even when it was honoring such arrangements), ARSN suffered unexpected adverse events such as unannounced sweeps of ARSN's bank account by the MA DOR – to the tune of several hundred thousand dollars, which left ARSN scrambling to make its current weekly payroll alone, and resulting in ever higher unpaid state and federal tax obligations.

Just prior to the Petition Date ARSN suffered problems with regional supermarket powerhouse Market Basket, which for about a six week period stopped ordering produce from its suppliers. ARSN supplied workers to the suppliers of produce for Market Basket and earned approximately $30,000 per week from that contract. Loss of the Market Basket-related contract just before the Petition Date contributed to the Debtors' financial crisis.

ARSN, which was in negotiations to sell its business to the Buyer prior to the Petition Date, became concerned about another tax levy (which would force a shut-down of the business and destroy its going concern value) because of the large amounts due to the IRS and the Commonwealth of MA, and that ARSN was in arrears, and filed its emergency Chapter 11 Petition.

**CURRENT CIRCUMSTANCES AND ASSETS**

The Court granted the Debtors' emergency use of cash collateral on August 1, 2014, and extended use of cash collateral after hearing at least until December 10, 2014 ("the First Cash Collateral Period"), when there is a further hearing on same. ARSN's cash position has remained stable during the First Cash Collateral Period. Both of the Debtors have been operating well during the First Cash Collateral Period, and have been able to fund payroll, tax and other business obligations currently.

The IRS has been granted replacement liens in the Debtors' cash.

On its Schedules, ARSN disclosed that there is an outstanding loan to shareholder, i.e. Purtell, owed to ARSN with a face amount due of approximately $1.7 million ("the Shareholder

3

Loan") and an unknown value, as Purtell's personal assets are also liened by the IRS. In addition, ARSN disclosed intercompany debt owed to ARSN by related non-debtor company Premier Medical ARSN, LLC, in the face amount of $950,000.00 ("the Intercompany Debt"), and an unknown value, as Premier Medical ARSN, LLC does not have the funds to repay this obligation. In addition, on ARN's schedules is a loan owed to ARN from ARSN, in the amount of approximately $1.7 million, for unpaid obligations, mostly tax obligations ("the ARN Loan").

Additional assets listed on ARSN's schedules include: the Debtors' customer list and contracts and good will/going concern value, valued at approximately $2.4 million dollars ("the Customer List"); approximately $426,000.00 in receivables for placing temporary workers (fluctuates on a weekly basis) ("the Employee Receivables"); a $300,000.00 refund owed to ARSN from the Paragon/Freestone worker's comp insurance receiver ("the WC Refund"); and a $300,000.00 judgment owed to ARSN by Nexus ("the Nexus Judgment"). ARSN also lists various rental locations, including the Debtors' main office in Bedford, NH and satellite offices in Dover, NH, Lowell, MA and Chelsea, MA and security deposits ("the Leases"), and office furniture/furnishings and computers located there, valued at approximately $5,000.00 ("the Furnishings"). ARSN has a bank account at Santander Bank and a bank account at People's United Bank ("the Bank Accounts"). All of the assets listed in this Paragraph are sometimes referred to collectively, as "the ARSN Assets."

## THE SALE

ARSN was negotiating with the Buyer Wicked Staffing Solutions, LLC ("Wicked") prior to the Petition Date, had signed a preliminary P&S, and had circulated same to the IRS. After the Petition Date, ARSN and the Buyer modified the P&S so that it contains terms which generally comport with the Bankruptcy Code. The Sale was noticed out to creditors and interested parties. Although there was interest expressed in the purchase, no other party made a competing bid, and Wicked was the successful bidder. The Sale Order approving the sale is dated December 15, 2014 (Doc. 191).

The basic terms of the Sale to the Buyer are (more fully described in the P&S):

A. Assets to Be Purchased by Buyer: The Buyer has acquired substantially all of the ARSN Assets, including its employees, the Customer List, the Employee Receivables, the WC Refund, the Nexus Judgment, the Leases, the Furnishings and the Bank Accounts. The Leases (in Bedford and Dover, NH and Lowell and Chelsea, MA), have been assumed and assigned as part of the sale, under Bankruptcy Code §365.

B. Assets Excluded From Sale: the Shareholder Loan, the Intercompany Debt, cash on hand at the closing (necessary to cover Debtors' current payroll) and any third party Chapter 5 Claims. Collectively, these assets are called "the Excluded Assets." Since the IRS has a lien on all of these assets (except the Chapter 5 Claims), the IRS as part of the sale will carve-out of its recovery $200,000.00 for the bankruptcy estate, (the "Carve Out Funds") plus professional fees. The IRS has indicated they agree to the sale on the record in the bankruptcy court. The IRS will not participate in the distribution of the Carve-Out Funds.

4

C. Purchase Price: up to $2.4 million dollars, payable over time as an "earnout" as follows: 50% of net income earned by Buyer's business every six months, beginning on June 1, 2015 and ending on the fifth anniversary of the closing date, until $2.4 million dollars is paid in full, provided that no more than $500,000.00 shall be paid in any applicable six month period ("the Earn Out Funds"). One million eight hundred thousand dollars ($1.8 million dollars) of the Earn Out funds are guaranteed by the Buyer as a minimum payment.

D. Closing occurred on December 21, 2014.

E. Carve-Out Funds. To the extent allowed by the Court at Confirmation, the Carve-Out funds shall be paid when received out of the Earnout Funds; the Earnout Funds shall be split 50/50% with the IRS until the $200,000.00 Carve-Out Funds threshold is reached. The Debtor or disbursing agent under a plan shall collect the Carve-Out Funds and distribute them to claimholders pursuant to further order of the Court. The estate shall split the Carve-Out Funds 2/3 to the State of Massachusetts and other §507(a)(8) claimants other than the IRS, and 1/3 to unsecured creditors—after the payment of administrative expenses ($66,666.00 for general unsecured creditors.) To the extent the Court does not approve the Carve-Out under the Plan all funds will be paid to governmental units (or senior priority claim holders if appropriate).

F. In addition to, and not as part of, the Carve-Out Funds, Professional Fees of Cleveland, Waters and Bass and the Examiner shall be paid upon court approval from the Earn Out Funds prior to payment of the Carve- Out Funds. These fees shall be deemed carve-out funds from the IRS lien, not estate funds.

I. Method of payment: Payments shall be made from a Carve-Out of the IRS senior secured claim. Payments shall be administered by a Plan Trustee who shall be appointed in the Plan. A Plan Trustee shall be appointed upon the confirmation of a Plan that shall have the obligation to receive the payments from the Buyer, pay the Administrative and Carve-Out Claims and to pay the IRS as well as to enforce any default in payment against the Buyer as well as pursue Chapter 5 claims.

THE BUYER

The Buyer is a company owned by Purtell's daughter Giuffre. Giuffre has a completely new vision for the business and has no intention what-so-ever of involving Purtell in the financial aspects of the Buyer's business at all. Purtell will have no control over the "Check book" or financial decisions of the Buyer. Purtell has an employment contract with the Buyer and will remain involved to service customers only.

PURTELL

As stated above, although there are claims against Purtell by ARSN, the IRS has a lien on any claim ARSN has against Purtell. Further, Purtell is personally liable to the IRS for the trust fund portion of taxes in an amount of millions of dollars. All of Purtell's assets are liened by the IRS. In addition the IRS has a lien on all assets of the Debtors including the

Intercompany Debt. Therefore, the Excluded Assets, other than Chapter 5 Claims, which are unencumbered, are collateral for the IRS.

## ARTICLE II

## THE PLAN

### CLASSIFICATION OF CLAIMS AND INTERESTS

In accordance with §1123(a)(1) of the Bankruptcy Code, all Claims against the Debtors, of whatever nature, and all Interests, whether or not scheduled, absolute, unliquidated or contingent, including all Claims arising from the rejection of executory contracts, whether resulting in an Allowed Claim or not, are classified as set forth herein. A Claim shall be in a particular class only to the extent it is within the definition of the class and only to the extent it is an Allowed Claim.

Secured Claims -

    Class 1 - Secured Tax Claims of the Internal Revenue Service

Section 507 Priorities -

    507(a)(2) Administrative Expense Claims and Senior Priority Claims

    Class 2 – Section 507(a) (8) Priority Claims

Unsecured Claims -

    Class 3- Unsecured Claims.

Interests -

    Class 4 – Richard Purtell.

### TREATMENT OF CLASSES

The Plan proposes the following treatment to each of the classes of creditors:

Secured Claims -

Class 1-Secured Claims of the Internal Revenue Service[1]. The Secured Claim of the Internal Revenue Service is in the amount of up to $2.4 Million Dollars, secured by the

---

[1] Both the State of Massachusetts DOR and the MA department of unemployment assistance filed claims that they listed as partially secured in the ARSN case, The claims were perfected in the towns of Massachusetts, they were not filed with the NH SOS office where liens against ARSN are supposed to be recorded b/c ARSN is a New Hampshire Corporation.  So they are not perfected properly. Plus the IRS recorded the bulk of its liens first in time and based on the value of the Assets, Massachusetts is unsecured under 506(b).  To the extent the Court determines otherwise, then the Plan would need to be modified to account for different priorities in the Assets.

"Assets". The IRS shall be paid from it lien on the proceeds of sale, the Earn-out Funds, as provided in the Asset Purchase Agreement, as provided more fully below:

> Purchase Price: up to $2.4 million dollars, payable over time as an "earnout" as follows: 50% of net income earned by Buyer's business every six months, beginning on June 1, 2015 and ending on the fifth anniversary of the closing date, until $2.4 million dollars is paid in full, provided that no more than $500,000.00 shall be paid in any applicable six month period ("the Earn Out Funds"). One million eight hundred thousand dollars ($1.8 million dollars) of the Earn Out funds are guaranteed by the Buyer as a minimum payment.

The minimum payment from the Earn-Out shall be $1,800,000.00, guaranteed by Wicked. The maximum payment shall be no more than $2,400,000.00.

The IRS shall retain its liens against the Debtors including in the Earn-Out to the same extent and priority as they held pre-petition, that being a first priority lien in the Earn –Out funds, subject only to the Carve-Out and payment of Administrative Expenses of the Debtors as provided in the Sale Order.

The IRS shall also retain its lien in the Shareholder Loan and Intercompany Debt receivables and shall have the exclusive right to pursue collection of and compromise such Assets as a secured creditor in them in accordance with title 26 of the United States Code. The IRS also has separate liens in Purtell's personal assets. In the unlikely event the IRS is fully paid, than collection of these Assets may be pursued by the Plan Trustee. Such eventuality is extremely unlikely since the IRS filed a secured proof of claim for $6,716,808.01 in ARSN, and the Assets appear to be worth at most $2.4-3.0 million dollars. For purposes of distribution as an unsecured 507(a)(8) priority creditor, the IRS shall be deemed to have a deficiency claim of $4,000,000 for both estates)(see class 2 below).

The IRS is impaired.

§507(a) (1) Administrative Expense Claims and Priority Claims - Allowed Claims of professionals entitled to priority pursuant to §507(a)(2) consist of the claims of attorneys engaged by the Debtors or any other party under §330 as may be approved by the Court and, unpaid post-petition operating expenses that qualify under §503(b), if any. These claims are not impaired. All Administrative Expense Claims shall be paid in full in cash on the Effective Date of the Plan, unless other terms are agreed upon by any such claimant. To the extent professional fees are not approved as of the Effective Date, the Plan Trustee will reserve funds for the full amount of the requested or estimated fees and disburse such funds upon final Court approval. The U.S. Trustee has been paid all quarterly fees to date and will be paid its quarterly fees until this case is closed. The estimated Administrative Expense Claims consist of the fees of Cleveland Waters and Bass, P.A., and the Examiner. The fees and expenses total approximately $50,000.00 (net of amounts already paid) at this time. It is impossible to estimate the total amount of fees and expenses through confirmation. Plus the Plan Trustee will need to be paid for collecting the Earn-Out funds and pursuing the Chapter 5 claims. Administrative Expenses shall be paid (or reserved for) after the Effective Date, or if unresolved upon the receipt of the Earn-Out Funds, from the Earn-Out Funds. Payments shall be made by the Plan

Trustee. Administrative Expenses shall be paid in full from the Earn-Out prior to any payment to the IRS, except that administrative expenses pursuing chapter 5 claims, may only be paid from recoveries in the Chapter 5 claims. Notwithstanding anything to the contrary in this Plan Administrative Expenses shall be paid first before any other creditor secured or unsecured from the Earn-Out or Chapter 5 claims.

There does not appear to be any Priority Claims senior to 8th Priority Claims. If there are they will be paid ahead of 8th Priority Claims out of the Carve-Out Funds.

Class 2 Section 507(a)(8) Priority Claims – These are the priority claims of governmental units entitled to (a)(8) priority under section 507(a)(8) of the Bankruptcy Code. They total approximately $1.3 million and consist mostly of the claims of Massachusetts and New Hampshire. These claims are impaired. They shall be paid as follows:

(1) $133,333,33 paid from the Carve Out funds paid as follows: the Carve-Out funds shall be paid when received out of the Earn-Out Funds; the Earn-Out Funds shall be split 50/50% with the IRS until the $200,000.00 Carve-Out Funds threshold is reached. The Disbursing Agent under a plan shall collect the Carve-Out Funds and distribute them to claimholders pursuant to further order of the Court. The estate shall split the Carve-Out Funds 2/3 to the State of Massachusetts and other §507(a)(8) claimants other than the IRS, and 1/3 to unsecured creditors—after the payment of administrative expenses ($66,666.00 for general unsecured creditors.) To the extent the Court does not approve the Carve-Out under the Plan all funds will be paid to governmental units (or senior priority claim holders if appropriate); and

(2) payments from any Chapter 5 recoveries after payment of Administrative Expenses (and any other priority claim, if any) With respect to the Chapter 5 recoveries the IRS' deficiency claim in the amount of 4,000,000.00, shall be included as a Claim in the distribution.

Class 3 Unsecured Creditors- These are the claims of general unsecured creditors, not entitled to priority in the estimated amount of $3.2 million dollars. These claims will be paid as follows: (1) payment of $66,666,67 from the Carve-Out Funds (as described above) and any recovery from Chapter 5 claims after payment in full of Administrative and all Priority Claims. Class 3 Claims are impaired.

Class 5-Interests – This Class consists of all Interests. On the Effective Date. Class 5 Interests shall be deemed cancelled, terminated, null and void and of no force and effect. Holders of Allowed Class 5 Interests will not receive any distribution of any kind under the Plan on account of Allowed Interests.

Reservation of Rights. Nothing contained herein shall be deemed to limit the right of the Debtors, or any other party to object to any Administrative Claims (including, without limitation, fee Claims and cure amounts), Priority Claims, other Priority Claims, general Unsecured Claims (including without limitation Claims for rejection damages under Section 365 of the Bankruptcy Code) and Secured Claims  Nothing contained herein shall affect the Debtors' rights and defenses both legal and equitable, with respect to any holder of a Claim against the Debtors, including but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments.

# ARTICLE III

## MEANS FOR EXECUTION OF THE PLAN

Upon entry of the Order of Confirmation, all matters provided under the Plan shall be deemed authorized and approved without any requirement of further action by the Debtors the Debtors' boards, officers and shareholders.  The entry of the Order of Confirmation will constitute authorization and direction for the Debtors to take or cause to be taken all corporate or other actions necessary or appropriate to consummate and implement the provisions of the Plan prior to, on and after the Effective Date, and all such actions taken or caused to be taken will be deemed to have been authorized and approved by the Bankruptcy Court. All such actions will be deemed to have occurred and will be in effect from and after the Effective Date pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the partners, members, stockholders, administrators, agents, officers or directors of the Debtors.

Upon entry of the Order of Confirmation, the Plan Trustee will be appointed who shall perform the tasks listed in the Plan including Collecting the Earn-Out funds and pursuing Chapter 5 Claims and the Plan Trustee shall act as the Disbursing Agent under the Plan and as otherwise described in Article XII below.  The Plan Trustee shall be the Sole Shareholder and Director of the Debtors for purposes of winding down the Debtors' affairs.  The Plan Trustee shall be authorized, without further order of the Court, to employ and pay accountants and lawyers as needed to wind down the Debtors, and to prepare and file tax returns.

The Plan Trustee shall have the sole right to pursue and/or settle Chapter 5 actions under the Bankruptcy Code.  The Plan Trustee shall hold all funds to be distributed in the Plan in a trust account for the benefit of holders of Allowed Claims, until distributions are made, which are in the discretion of the Plan Trustee. The Plan Trustee shall not be required to have a Bond.

## EXECUTORY CONTRACTS/RELEASE OF CLAIMS

Any person or entity holding a Claim arising from the rejection of any executory contract shall hold an Unsecured Claim against the Debtors' estate and shall file a Proof of Claim for any damages arising from such rejection within thirty (30) days of rejection or such further time as shall be designated by the Bankruptcy Court or be forever barred from asserting such Claim.  All executory contracts not specifically rejected or expressly assumed and assigned by the Debtors during the Chapter 11 Case or pursuant to this Plan shall be deemed rejected on the Effective Date of the Plan.

## DISCHARGE OF LIENS, DISPUTED CLAIMS
## AND CLAIMS OF THE TRUSTEE AGAINST THIRD PARTIES

Unless otherwise expressly preserved in the Plan, all mortgages, liens, attachments and other claims of record encumbering any Assets administered under the Plan shall be deemed discharged, released and extinguished as of the Confirmation Date.  All Creditors holding such

liens or Claims shall execute the necessary documents to release such liens or claims after the Confirmation Date, upon request in writing of the Debtors. The property administered under the Confirmed Plan shall be free and clear of liens except those liens expressly preserved in the Confirmed Plan. If any such Creditor fails to execute such documents, its lien or Claim shall be discharged under the Confirmed Plan as of the Confirmation Date or as otherwise indicated in the Confirmed Plan, and same may be recorded in the appropriate public offices as evidence of such discharge. Since this is a liquidating plan the debts under the plan will not be discharged.

Objections to Disputed Claims or any other Claim in this case shall be filed by the Plan Trustee with the Bankruptcy Court and served upon each holder of such Disputed Claim or other Claim as soon as practicable, but in no event later than sixty (60) days after the Confirmation Date, unless an extension of such date is requested by the Plan Trustee. The Plan Trustee shall litigate to judgment, settle or withdraw objections to Disputed Claims. No other entity will have authority to pursue any Disputed Claims on behalf of the Debtors, or the estate, arising under the Bankruptcy Code or other applicable law except the Plan Trustee.

Disputed Claims not subject to final resolution at the time payments are due to the Class of which such Claims may be a part shall have such payments held in escrow by the Plan Trustee pending final resolution. Any funds made available to a Class generally from such escrowed funds shall be disbursed to remaining holders of Claims in such Class.

Notwithstanding anything to the contrary in this Plan or the Disclosure Statement, the Debtors reserve the right to object to any claim, or portion thereof within the time frame provided by this Plan.

## POST-PETITION CLAIMS

All post-petition allowed administrative expenses of the Debtors will be paid in accordance with the Plan.

The Plan Trustee shall have no liability to anybody as a result of the Plan Trustee's activities under the Plan absence gross negligence or fraud.

## SUBSTANTIAL CONSUMMATION

Pursuant to 11 U.S.C. §1101, consummation of the Confirmed Plan shall occur on or after the Effective Date.

## INFORMATION IN PLAN AND DISCLOSURE STATEMENT

All information in the Plan and Disclosure Statement has been provided solely by the Debtors or from records of the Debtors. The Debtors have or will engage an accountant to review the tax consequences of the transactions contemplated in the Plan on the estate. Each Creditor is advised to contact its own accountant to determine the tax consequences to it.

### CONFLICTING TERMS AND TIME OF THE ESSENCE

Notwithstanding anything to the contrary in the Disclosure Statement, the terms of the Plan shall control.  TIME IS OF THE ESSENCE with respect to all dates and time periods.

### POSSIBLE CLAIMS AGAINST THIRD PARTIES

The Debtors are not aware of any claims against third parties except for the claims identified in the Disclosure Statement.

### TAX CONSEQUENCES OF PLAN

The Debtors are taxed as corporations The Debtors do not believe, however, that there will be any significant (or any) tax liability in this case since the transactions contemplated by the Debtors will result in significant losses for the Debtors. Debtors are, however, reviewing this position with an accountant at this time, and will have more definite information prior to confirmation.  The settlement in the Plan will not result in any cancellation of indebtedness income pursuant to 26 U.S.C. §108 (The Internal Revenue Code).

### STATUS OF THE DEBTORS POST-CONFIRMATION

The Debtors shall be substantively consolidated with each other on the Confirmation Date.  The surviving entity shall be ARSN in the control of the Plan Trustee, who shall fully liquidate the enterprise by collecting and distributing the Earn-Out funds, preparing tax returns and pursuing Chapter 5 claims in accordance with the Plan.  The Plan Trustee shall be paid from the Earn-Out funds for any administrative cost (including legal and accounting) of the liquidating Plan ahead of the Secured Creditor, but any cost associated with Chapter 5 claims may only be paid from recoveries from the Chapter 5 claims.  The parties shall execute all documents necessary to implement the Plan Trustee's duties and responsibilities in the liquidation of the Debtors.  At the conclusion of the liquidation, which shall occur after all Earn-Out payments are made or it is determined by the Plan Trustee the payments will not be made or otherwise  from the date determined by the Plan Trustee to be the conclusion of the liquidation, the Debtors shall cease to exist.

### MISCELLANEOUS PROVISIONS

<u>Pre-Confirmation Modification</u>. On notice to and opportunity to be heard by the United States Trustee, the Plan may be altered, amended or modified by the Debtors before the Confirmation Date as provided in section 1127 of the Bankruptcy Code.

<u>Post-Confirmation Immaterial Modification</u>. With the approval of the Bankruptcy Court and on notice to and an opportunity to be heard by the United States Trustee and without notice

11

to holders of Claims and Interests, the Debtors may, insofar as it does not materially and adversely affect the interest of holders of Claims, correct any defect, omission or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite consummation of this Plan.

Post-Confirmation Material Modification. On notice to and an opportunity to be heard by the United States Trustee, the Plan may be altered or amended after the Confirmation Date by the Debtors in a manner which, in the opinion of the Bankruptcy Court, materially and adversely affects holders of Claims, provided that such alteration or modification is made after a hearing and otherwise meets the requirements of section 1127 of the Bankruptcy Code.

Withdrawal or Revocation of the Plan. The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors withdraw this Plan or if confirmation or consummation of the Plan does not occur, then (a) this Plan shall be null and void in all respects, (b) any settlement or compromise embodied in this Plan (including the allowance, fixing or limiting to an amount certain, any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or leases affected by this Plan, shall terminate and be of no further force or effect in the case of a withdrawal and/or revocation of the Plan and any document or agreement executed pursuant to this Plan shall be deemed null and void and (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other person, (ii) prejudice in any manner the rights of Debtors or any other Person or (iii) constitute an admission of any sort by the Debtors or any other person.

Successors and Assigns. The rights, benefits and obligations of any person or entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such person or entities.

Comprehensive Settlement of Claims and Controversies. Pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Equity Interest or any distribution to be made pursuant to the Plan on account of any Allowed Claim or Allowed Interest. The entry of the Order of Confirmation shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or causes of action of the Debtors and its estate, including, without limitation, any person or entity seeking to exercise a right in a derivative capacity on behalf of the Debtors' estate and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, their Estates, their property and Claim and Interest holders and is fair, equitable and reasonable.

Preservation of Insurance. This Plan shall not diminish or impair the enforceability of any insurance policy, right or claim that may cover Claims against the Debtors (including, without limitation, their members, managers or officers) or any other person or entity. Likewise, the Plan and Order of Confirmation shall not impair any insurance carrier's rights, claims,

defenses or disputes under any policy and shall not act to increase or extend any rights of the Debtors or the carriers.

Cramdown. To the extent any impaired Class or Interest entitled to vote on the Plan votes to reject the Plan, the Debtors reserve the right to request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to such Class(es), as well as with respect to Classes that are deemed to reject the Plan.

Notices. Any notice required or permitted to be provided under the Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery or (c) reputable overnight courier service, freight prepaid.

Saturday, Sunday or Legal Holiday. If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

Severability. If any term or provision of the Plan is held by the Bankruptcy Court prior to or at the time of Confirmation to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted.  In the event of any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan may, at the option of the Debtors, remain in full force and effect and not be deemed affected.  However, the Debtors reserve the right not to proceed to Confirmation or consummation of the Plan if any such ruling occurs.  The Order of Confirmation shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

> Headings. The headings used in this Plan are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the provisions of the Plan.
>
> Saturday, Sunday or Legal Holiday. If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such **payment** or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.
>
> Severability. If any term or provision of the Plan is held by the Bankruptcy Court prior to or at the time of Confirmation to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so

altered or interpreted.  In the event of any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan may, at the option of the Lender, remain in full force and effect and not be deemed affected.  However, the Lender reserves the right not to proceed to Confirmation or consummation of the Plan if any such ruling occurs.  The Order of Confirmation shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## ARTICLE IV

## LIQUIDATION ALNALYSIS

This is a liquidating Plan which provides a mechanism for the liquidation of the assets of the Debtors.  It is not substantially different from Chapter 7 except that it provides a mechanism, through the Plan Trustee, to receive the payments from the Buyer—Wicked and pay them to allowed claimholders.  It also provides a mechanism to pursue Chapter 5 Claims, which will also be through the Plan Trustee.  Without a Plan, there would be no mechanism to receive the funds from the Buyer.  The only alternative to the Plan is Chapter 7, which would have increased costs, but the same liquidation approach, and dismissal, which would eliminate court oversight from the process.  Under the circumstances the Debtor believes it is in the best interests of all parties for this case to proceed as a Chapter 11 liquidating case rather than a Chapter 7 liquidating case or dismissal of the case.

Based upon the dynamics of the case, the IRS has a lien in all assets far in excess of their value.  Claim holders will receive a recovery only through an SPM carve-out if allowed by the Court.  The Carve Out will result in an expected recovery of $66,667.00 for general creditors and $133,333.33 for 508(a)(8) claims.  The US Trustee intends to object to the Carve-Out to general creditors, if its position is sustained, all funds would go to 507(a)(8) claims, which includes the IRS deficiency claim, and no doubt will eat up all assets in this case.

 Net Preference recoveries might be $75,000.00, but all these funds will go to 507(a)(8) priority claim holders

The Intercompany Debt Claim and the Shareholder Loan Claim are liened by the IRS. The IRS also has direct claims against Purtell, and these will be handled by the IRS for their own benefit outside the Plan.  Should there be a recovery the IRS will reduce its claim dollar for dollar.

## ARTICLE V

### SUBSTANTIAL CONSUMATION

Under the Plan, ARN and ARSN shall be substantively consolidated.  ARN and ARSN are the same business.  The main reason ARN is a separate company is so it may have a separate retirement plan.  There is no business reason for ARN to be separate from ARSN.  Anyone that deals with the Debtors, could deal with either company's employees interchangeably.  When funds come in to ARSN they are advanced to cover ARN's payroll.  This case is essentially a priority creditor case.  Both ARN and ARSN have as creditors taxing authorities, so there really is no impact if the estates are consolidated.  There is also no effective way to separate the entities due to the intercompany debt and intertwined business existence.  Further, if the Court does not approve substantive consolidation the Debtors will merge on the Effective Date.

## ARTICLE VI

### SUMMARY

The Debtor has made every effort to resolve as many issues as possible in this case prior to confirmation.  The Debtor believes the Plan not only accomplishes these goals, but provides a realistic chance for Allowed Claim holders to receive significant recoveries in this case.

Respectfully submitted,
ARSN Liquidation Corp., Inc.
ARN Liquidation Corp., Inc.
By Their Attorneys

Cleveland, Waters and Bass, P.A.

Dated: February 6, 2015          By:     /s/ Steven M. Notinger
                                          Steven M. Notinger (BNH 03229)
                                          Two Capital Plaza, 5th Floor
                                          PO Box 1137
                                          Concord, NH  03302
                                          (603) 224-7761
                                          notingers@cwbpa.com

**CERTIFICATE OF SERVICE**

      I hereby certify that a copy of the foregoing was served on this date by ECF on the parties listed below and on the parties on the attached Service Lists via First Class Mail, Postage Prepaid.

Eleanor Wm Dahar on behalf of Interested Party Wicked Staffing, LLC
edahar@att.net

Ann Marie Dirsa on behalf of U.S. Trustee Office of the U.S. Trustee
ann.marie.dirsa@usdoj.gov

William S. Gannon on behalf of Interested Party CoWorx Staffing Services, LLC
bgannon@gannonlawfirm.com,
jarquette@gannonlawfirm.com;mjoyce@gannonlawfirm.com;bvenuti@gannonlawfirm.com

Geraldine Karonis on behalf of U.S. Trustee Office of the U.S. Trustee
Geraldine.L.Karonis@usdoj.gov

Walter L. Maroney on behalf of Creditor Employment Security State of NH, Department of
Walter.L.Maroney@nhes.nh.gov

Michael T. McCormack on behalf of Creditor IRS
michael.mccormack2@usdoj.gov, faye.guilmette@usdoj.gov;usanh.ecfcivil@usdoj.gov

Deborah A. Notinger on behalf of Debtor American Resource Network, Inc.
notingerd@cwbpa.com, guerettec@cwbpa.com;debbie@dntpc.com

Deborah A. Notinger on behalf of Debtor American Resource Staffing Network, Inc.
notingerd@cwbpa.com, guerettec@cwbpa.com;debbie@dntpc.com

Deborah A. Notinger on behalf of Debtor's Attorney Cleveland, Waters & Bass, P.A.
notingerd@cwbpa.com, guerettec@cwbpa.com;debbie@dntpc.com

Steven M. Notinger on behalf of Debtor American Resource Network, Inc.
notingers@cwbpa.com, guerettec@cwbpa.com;notingerd@cwbpa.com

Steven M. Notinger on behalf of Debtor American Resource Staffing Network, Inc.
notingers@cwbpa.com, guerettec@cwbpa.com;notingerd@cwbpa.com

Office of the U.S. Trustee
USTPRegion01.MR.ECF@usdoj.gov

Charles R. Powell, III on behalf of Creditor Devine, Millimet & Branch, P.A.
cpowell@devinemillimet.com,
sleonard@devinemillimet.com;cmaher@devinemillimet.com;junger@devinemillimet.com

Jennifer Rood on behalf of Examiner Jennifer Rood
jrood@bernsteinshur.com, mamurphy@bernsteinshur.com

Daniel W. Sklar on behalf of Interested Party Robert Purtell
dsklar@nixonpeabody.com,
hkilibarda@nixonpeabody.com;cbuonopane@nixonpeabody.com;man.managing.clerk@nixonpeabody.com;ccarlin@nixonpeabody.com

Peter N. Tamposi on behalf of Creditor State Garden, Inc.
peter@thetamposilawgroup.com, kdesisto@thetamposilawgroup.com


Dated: February 6, 2015              By:    /s/ Steven M. Notinger
                                            Steven M. Notinger (BNH 03229)